Okay, good morning. You are in the third division of the First District Appellate Court of Illinois and today we will hear oral argument in the case of CORE Mechanical and Lisa Sheehy v. JR Industries and Jesse Richardson. This is case number 1-21-1661. Basically, we're looking for 15 minutes of argument per side. We're familiar with the record and the briefs and if we unduly burden you with too many questions, we'll give you a little extra time, but I would ask the appellant to save some time for rebuttal. With that, we will start with the appellant. Wonderful. Let me introduce myself on the record. My name is Dawn Gonzalez on behalf of the appellants, Jesse Richardson and JR Industries. JR Industries for this appeal could be considered the landlord, but we consider both Jesse, the individual, and JR Industries, the company, together because there are multiple documents, multiple agreements that all go together. This is not just a landlord-tenant situation with an purchase, but that is primarily the main issue here. Let me pause to say I wanted to just introduce myself and who I represent and then to say may it please the court and jump into my argument. I appreciate that all of the justices have read the briefs and are familiar with the record. The record is certainly large and the briefs are certainly long and there are a lot cases that are cited. For those three reasons, somebody might take the impression that this is a complicated case. It's not or it shouldn't be. There should be a simple question here. Did Core Mechanical do what they had to do in order to trigger the option to purchase a commercial real estate property? The trial court found that they did and we submit in the briefs that there were three main errors in that finding. First, the trial court erred when it completely reinterpreted the contracts to require something else. The question, of course, is what did Core Mechanical have to do? In an option to purchase, usually that document, and sometimes it's a standalone document, that document will say exactly what the entity needs to do in order to trigger the option to purchase. This option to purchase was in a lease. That lease referred to a term guaranteed minimum 2016 compensation. That term is incorporated and defined in two different documents, an employment agreement and a binding letter of intent. The binding letter of intent was signed first. That's the only document that actually has a specific definition of those four words, guaranteed minimum 2016 compensation. The employment agreement goes much further in describing exactly what is required to compensate Mr. Richardson for 2016. The binding letter of intent tells us some things. It tells us a lot of things, but it doesn't tell us everything. It didn't tell us exactly when to start and when to end the time period. The employment agreement tells us specifically the compensation starts on January 1st, 2016, and the compensation payroll, compensation salary must continue through December 31st. There are five locations in the employment agreement where that requirement through 2016 comes in. Trial court ignored those five locations in the employment agreement and completely reinterpreted the requirement to mean merely that Mr. Richardson had to receive $104,000 in 2016, physically get money during those days in 2016. That is not what the contracts require. He needed to have salary through December 31st. The difference between in and through is important here because CORE Mechanical pays its employees, salaried, hourly, whatever, pays them one week in arrears. In order to be paid for the last week in December of 2016, there should have been a pay stub on Friday, January 6th, 2017. So when the court reinterpreted the contract to say merely give him $104,000, part of that error was the fact that the number $104,000 doesn't appear anywhere in the contracts. It ignored the five times in the contracts where it said must get salary through December 31st of 2016. It also ignored CORE Mechanical's actual practice at the time they were entering into this exact contract in which Mr. Richardson's wife, Anna Richardson, through the same exact contracts, which were signed on April 1st and then backdated effective to December 31st of 2015. So they were negotiating for a couple of months. They inked all the documents on April 1st. And in those documents, Anna was required to be, excuse me, her employment ceased. The term in the contract says Anna Richardson's employment will cease effective December 31st. CORE Mechanical knew that that provision was in the exact same contracts that they were signing. And CORE Mechanical knew that they paid Anna a pay stub one week in arrears for December 31st. And they gave that paycheck to her on January 4th of 2016. So they knew that they had this conduct. They knew that this conduct was exactly in relation to very similar contract provisions. And even if you accept this complete reinterpretation of the contract that CORE Mechanical needed to pay $104,000 based on a mathematical calculation that he was supposed to have 2,080 hours times $50 an hour, 2,080 times 50 equals 104,000. The W-2 shows that he got slightly more than 104,000. The biggest problem here is a mathematical error. That W-2 included 32 hours from the year prior. So CORE Mechanical was actually, even if you accept this argument, they were actually $1,600 short of the $104,000 requirement, because we know that this salary, and this was supposed to start on January 1st. W-2s show payment that is received for hours that are worked in other years. So that was the first error. The second error is that the trial court ignored clear evidence of existing, albeit smaller, monetary deficiencies with regards to what CORE Mechanical had to pay for quote-unquote back-end benefits to Union 597. The trial court first said, well, even though the auditor found deficiencies, the deficiencies for Jesse Richardson's back-end benefits were made up by the fact that CORE had paid other employees extra, and so the net was sufficient. That's not appropriate here. This contract did not say that CORE Mechanical had to pay all of its employees back-end benefits correctly. This contract said they had to pay Jesse Richardson's back-end benefits correctly. So the trial court used a different measuring stick to determine whether or not there was a deficiency. Plus, this auditor told CORE Mechanical that it had deficiencies in its submissions for Jesse Richardson specifically through an email that was dated October 14th, 2016, a couple of months before CORE Mechanical started to attempt to trigger the option to purchase. So they knew they had deficiencies. They knew that the auditor believed that there were deficiencies specifically for Jesse Richardson. When that audit became final, the union president confirmed the audit findings. There were deficiencies. After the union told CORE Mechanical that there were deficiencies, CORE Mechanical didn't object, didn't contest, and they eventually paid those deficiencies. So those were clear deficiencies that existed. The third error was that the trial court excused some of the deficiencies for a couple of different reasons. The trial court never used the term waiver, but the trial court did say something along the lines of Jesse Richardson didn't bring up some of these deficiencies. That's irrelevant and actually not factually correct. That's an error. Jesse Richardson's side through his attorney in early December warned CORE Mechanical that it was supposed to pay the payroll correctly, pay the correct number of hours to him correctly for that he was reserving his right and that they needed to comply with this provision. They did not. The specific email exchange where waiver is being argued by CORE Mechanical comes in January, where the CORE Mechanical officer, Michael Roddy, is presenting what is in his words last payments. I'm giving you evidence of last payments being made. There is never in Michael Roddy's email does he say this is the last payment we will not be making anymore. And this is important because the reply from our side comes on January, Wednesday, January 4th 2017, where there are some issues that are being raised because there were other deficiencies in other contracts, not relevant to this appeal, but they were brought up in the email. At the time that our attorney sent the Wednesday, January 4th email, it was two days prior to the there wasn't a deficiency yet. We couldn't complain that they hadn't made the payroll yet because it wasn't due until the Friday the 6th. That is not a waiver. There are times where courts can assert equitable principles to basically say close is good enough. There are times where that can happen. There are some contracts where that can happen. And there are some excuses that can be pushed off to the side, but it is distinctly much more narrow opportunities to apply any kind of equity when you are talking about an option because it's a unilateral contract, especially when the option is in a lease and not just are we going to extend the lease? Are we going to shorten the lease term? But when it is to purchase commercial property at a sweetheart deal of just the outstanding mortgage price, that is a unilateral contract in which there were set requirements that had to be made in order to get that special deal and they were not met here. And here's where this is really important. These specific conditions precedent, and everybody agrees their conditions precedent, were specifically put in here because in this commercial business divorce of two guys who, as with many divorces, ended up not liking each other. This does sound like a divorce case. Mr. Richardson specifically wanted to tie the option to purchase the commercial building to make sure that Lisa Sheehy, the actual purchaser of the corporate ownership, and Core Mechanical, the entity, did everything that they had to do in order to pay him everything. All sides, there's testimony in the record, all sides agree that that was the essence of this deal, right? So that makes it even more important that they comply. And in those cases that talk about equity might be able to excuse some things, it's important to look at what were those courts excusing, right? Many of the cases dealt with the condition precedent in an option was that a written notice had to be delivered by a certain time. That's it, right? That's not our issue here. Our issue is did they pay the right amount in order to purchase the company at all, right? So this is what I would consider to be a bigger problem, a bigger deficiency than just did you mail the letter to the correct address? Did somebody pick up the mail from the post office? Those are facts in some of the other cases, right? What is being alleged here and what the equity that they are trying to address? I'm going to reserve, I would hope, three minutes to address their equity arguments and why they should not apply. But what I will say here to try to end my portion is that there was nothing equitable about this ruling where this particular trial court judge did, ended up doing exactly what the Supreme Court warned against. The trial court reinterpreted a contract to change the terms upon which CORE could purchase property and then said all these other deficiencies I'm just going to ignore and allowed CORE Mechanical to get the benefit of a deal, a sweetheart deal to purchase commercial real estate at the outstanding mortgage price without having to actually comply with the terms. So I'm going to end here and reserve I think five minutes to respond to why equity arguments should not apply here. Any questions for my colleagues? I have a question. Would you agree that count one, the specific performance count and the breach of contract? No, not necessarily because the breach of contract is focused on you haven't gone through with the option, right? The difference is in count one, the remedy is go forward, force you specific performance, go forward and do the option and can finalize the deal and transfer title. That's what happened here. And count two was left hanging? Correct. Okay. That's my only question. If I can follow up. Council when you made your motion for 304A finding, it appeared that you wanted it on the order granting summary judgment on count one and count two. Is that correct? The 304A language came after the trial court judge granted the summary judgment, denied our 305B request to stay that judgment, entered an order requiring the title to be transferred. It has been transferred under the conditions that are set forth in that last judgment order. And the 304A language applies to all of those orders. We have cross motions for summary judgment on the exact same facts. No one can test these facts about whether, we don't have a dispute over the facts. We just have a dispute over whether or not a fact is relevant and can be ignored. But the 304A finding went only to count one. Is that correct? I would have to look back at that order specifically, but no, my understanding is that 304A language applied to all, both the grant in favor of their summary judgment motions on one and two, and the denial of our summary judgment motions on counts one and two. So then the breach of contract count two was disposed of in the summary judgment in the 304A? It was in the sense that the option was declared to have to go forward. There was no remedy of damages for a breach of contract or anything like that. And there was no finding with regard to the breach of contract? I guess I'm struggling to understand the question and how it might pivot things. Because if the 304A did not include count two, they're related counts. So then we have a jurisdictional problem if the related counts were not addressed in the 304A. The only thing that was there, because there was a requirement to go forward with the purchase, there was no longer a breach of failure to go forward with the purchase. So the remedy of specific performance transferred the title. So there was not a specific finding of any damages for breach of contract. But both count one and count two are in the findings in the orders and are applicable for the 304A language. Well, I'm looking at her order of December 14th, and it says that the 304A refers to count one. Your honors definitely have jurisdiction over this ruling. And because there's no other, let's put it this way. There is no other breach of contract being alleged other than go forward with the option to purchase. So there is a subsuming of the two issues together. They both completely and wholly relate to the option to purchase. Which may be the issue, because they do relate to the breach, the alleged breach of your client to go forward on the option. Summary judgment was entered on both counts. They were plotting the alternative. So what the court did was give specific performance. What would happen if we would find specific performance? Here was not, was an abuse of discretion. Doesn't necessarily. We can't go on to say what are the breach of contract damages. So they are completely overlapping. If core mechanical did not do what it had to do and meet the conditions precedent to trigger the option to purchase. There is no breach of contract. In failing to go forward with the option to purchase. They are the same issues. Does that that sort of leads me to think that the 304A finding as to just count one. Could be found to have been not. The discretion in granting that did not properly consider. The factors that must be considered on a 304A finding, whether there are related claims, whether this would result in piecemeal appeals. So, you seem to be indicating that they are related. And I know this is an issue that that was not raised by the parties. You're caught up, correct? And certainly appellate, you have. Full authority to question proper jurisdiction and whether or not 304A is appropriate. It is appropriate here because the two counts are completely subsumed together. So, just as much for to ask the question of what and we're not saying this is what we're doing. We're trying to parse this out. What if we were to find that the grant of specific performance was incorrect here? What happens then if the interrelated count isn't also addressed on appeal? So, if you find that they did not do what they had to do to trigger the option to purchase. You would reverse the trial court's decision. Remand and I submit because there are cross motions for summary judgment without any dispute over facts, just questions of law. You would instruct the trial court to reverse the title transaction. And then they could proceed on the breach of contract. So, we're right back where Justice Rochford said that we're almost doing piecemeal litigation. But no, because the finding is they did not do what they had to do to trigger the option to purchase. Therefore, there is no breach of contract for failing to go forward with the option to purchase. The only breach here is failing to go forward with the option to purchase. Okay, thank you. All right, let's hear from the appellee. May it please the court. Kim Jansen on behalf for mechanical. And if it's jurisdictional and we're right there, I want to jump right in on the 304a issue that your honors have raised. My understanding is that counts one and two are pled in the alternative, but I understand the concern that this court is raising that whether or not the summary judgment on count one, which is judgment as to both liability and relief, whether that's sufficiently final for purposes of 304a given that damages haven't been addressed on count two. It's not so much final, is that 304a, it's not, you can't make it to even if there is a final judgment as to specific performance, if it doesn't resolve all the related issues. Right. But if they're part of the same claim, I'm trying to remember the specific. Yeah. Pleading and alternate relief or. I would suggest if the court is open to it, is that perhaps both myself and opposing counsel could prepare within a week or two, just a brief supplemental brief for you on the jurisdictional question, because you're right. We haven't fully delved into that aspect of the 304a language. We'll think about that. Go ahead. Okay, absolutely. So I think counsel's right. And this court is right that there's certainly a feeling of a divorce case in this otherwise business dispute. And I'm going to start actually by agreeing with opposing counsel. I know that doesn't happen every day on appeal. But I'm going to agree that when you strip away kind of all that animosity and all the distractions that kind of come with the bitter feelings at the divorce stage of a breakup, when you strip that all away and you just focus in on the language of the contract, this does become a remarkably straightforward case. What is the guaranteed minimum 2016 compensation? And was it satisfying? And I'm going to agree with counsel on a second point, and that's that the difference between the word in and the word through is, in fact, important. Where I'm going to disagree, however, is on the idea that we would look to the binding letter of intent for the definition of guaranteed minimum compensation. The contract that we're construing in this case, the option to purchase, is contained within the lease agreement. The lease agreement not only contains its own definition of guaranteed minimum 2016 compensation, but it also contains an integration clause specifically agreeing that prior agreements and written understandings of the party are irrelevant, that the entire agreement is the lease agreement. And the language of the lease agreement in defining the guaranteed minimum compensation is, in that employment agreement, seller Jesse Richardson is entitled to receive a minimum compensation in the word in 2016, and then defines in parentheses, that's what guaranteed minimum 2016 compensation refers to. And that's in the recitals to the lease agreement at B2488. So when you focus in on that language and you focus in on the fact that the guaranteed compensation is the compensation that is owed, that is to be paid, that is to be received in 2016 under the employment agreement, there is no dispute under the facts in this record that CORE fully satisfied that compensation. The employment agreement defines the rate of pay to be paid to Mr. Richardson, to be received by Mr. Richardson in 2016. He is to receive once a week a check at the rate of $50 an hour for 40 hours, $2,000 a week, times 52 weeks a year, that gets to that $104,000 sum. I agree that the lump sum isn't in the contract because the contract was designed for this to be made as weekly payroll type of payments. But at the end of the year, those weekly payments needed to add up to $104,000. They did, and then some, because CORE provided a raise to Mr. Richardson that it wasn't required to, but it did. $580, probably not going to change his financial circumstances drastically one way or another, but it's in excess of what CORE was required to pay. The question of that initial 2016 pay sub, it reflects 32 hours in 2015 or not, that's irrelevant. That's a red herring. For one, the pay sub doesn't actually assign where the hours were accumulated. It's just a pay sub for a period. But the point is that under the lease agreement, what is relevant is the payment was made in 2016. He was to receive 52 payments of $2,000 apiece in 2016, and he received that in full. And in fact, JR Industries Council, Mr. Thompson conceded in his December 8, 2016 email that the guaranteed minimum compensation was 2,080 hours plus back-end benefits. And that's at C-5354. In addition to conceding prior to January that that would be the amount that CORE had satisfied, 2,080 hours, Mr. Thompson's January 4 email was indeed a waiver of any argument that CORE failed to satisfy the guaranteed minimum compensation. Mr. Rohde's email on January 3 of 2017 didn't say, I'm attaching some documentation of some payments toward the guaranteed compensation. He didn't say, I'm attaching documentation of the second-to-last payments for the guaranteed minimum compensation. He said, I am attaching for you documentation confirming that CORE has paid the last payments of the guaranteed minimum 2016 compensation. And he attached to that the ADP payroll documentation, as well as an ACH payment to the union for the back-end dues. Once Mr. Thompson received that, if he believed that those were not final payments of the guaranteed minimum compensation, it was incumbent upon him to say, no, no, no, that's not the full guaranteed minimum 2016 compensation. There's some deficiency. He didn't. He said, here are six other unrelated things that Mr. Thompson will perform the option. He did not say that there was any defects in the guaranteed minimum compensation. And in Andrew Lohr-Bottling Company v. Sergeson, the court explained that when a party has a right to insist on a condition precedent, such as the guaranteed minimum compensation, party will waive that condition precedent by placing his refusal to perform on other grounds. And that is precisely what Mr. Thompson's January 4 email did. It placed the refusal to perform on six unrelated grounds that had nothing to do with whether or not the guaranteed minimum 2016 compensation was fully paid. CORE also paid the back-end benefits in full as required. Again, the back-end benefits payments are for the year 2016. Oh, excuse me. The compensation of those back-end benefit payments is according to the union rules based on hours worth. But the employment agreement is sort of based on a fiction of work, the fiction that he's working 40 hours a week throughout 2016. J.R. Industries' complaint is that while there were two holidays which were reported to the union as holiday pay, but I actually did some work on those holidays under a side agreement. And so I should get extra back-end benefit for those two days. But if you applied that reasoning to this contract, then the vast majority of the time that CORE reported to the union should not have been accompanied by back-end benefits because Mr. Richardson conceded that he worked almost no hours in 2016. He performed almost no actual work. And I believe no work at all after it was either March or April. So if he's going to claim that performing work on two holidays entitles him to additional back-end pay, the same reasoning would compel the conclusion that he was entitled to no back-end pay for most of the rest of the year, which would result at the end of the day in him having received far more back-end benefits than he was entitled to. As for the audits, I think that this can get a little bit confusing because the way that the union dues are paid, CORE doesn't make separate payments for each individual employee that it has to the union. It makes a collective payment for all of its employees to the union at one time, the 15th of the month or the month preceding, and then it breaks down how it calculated that. When the union does the audit, it goes through and it checks, okay, here are the payroll hours that were reported. Here's what the union dues remittance reported. There are some discrepancies. Are there discrepancies? Both of the audits in this case found a net overpayment by CORE of its union benefit payments. Now, some of that is based on other individuals. Some of that's based on Mr. Richardson. I think we spelled out in the brief that there were a lot of overpayments preceding 2015 for Mr. Richardson for which CORE was entitled to a credit. But the point is they paid every penny to the union throughout 2016 for their employees that they were required to pay for back-end benefits. When the union does the audit and finds the discrepancies, when there's an overpayment here and an underpayment there, it takes the net. It says there's a net overpayment. It adjusts the bookkeeping to make sure that the bookkeeping reflects where the buckets as it was referred to in the trial court, that it's all sort of attributed to the correct bucket and then lets the employer CORE in this case know, hey, you overpaid for your next remittance. You've got a credit for $1,000 or $2,000 or whatever it is. But CORE paid the back-end benefits in full for Mr. Richardson. The only thing left then is this $6 401k remittance, which is just an absent giant red herring. For one, if you look at how JR Industries defines back-end benefits in its own brief at page 14, it explains the back-end benefits are the payments mandated under union rules for hours each employee worked that CORE properly reported to union 597. 401k remittances are not payments to the union mandated under union rules. It's money that was withheld from Mr. Richardson's paycheck and then is remitted to his 401k. No question a mistake was made. Also no question the mistake was remedied, rectified with interest within the term of the lease. So there is no discrepancy there. And finally, even if this court were to interpret the contracts the way JR Industries asks it to, and even if this court were to find that that results in there being some discrepancy in the total amount. And at this point, we are talking about maybe $1,000, $2,000 on a contract that was well over a million dollars at the end of the day. I think just excuse exists to excuse that deficiency because the trial court agreed with CORE's interpretation. There's no question that CORE's interpretation was reasonable, that it in good faith paid what it thought was owed. And if the contract was unclear and is interpreted that it was incorrect in its interpretation and the trial court was incorrect in its interpretation, given the reasonableness of CORE's position and given the de minimis amount of the difference between the amount owed under the both parties' definitions, under Deichmann, that's a mistake that amounts to just excuse for failing to satisfy the guaranteed minimum compensation. If the court doesn't have any further questions, I would simply ask that you affirm the trial court. I have none. No questions. Thank you. I just want to go back to the 304 because giving it further thought, the trial court could not have made a 304A finding on count two. Correct. Because it wasn't a file. It was not a file. It was not a final order, but it was still a pending claim, which was related to the same facts and same breach as count one. Correct. So, yeah, so then that is the question, jurisdictionally, whether count one and count two are sufficiently distinct branches of the controversy that a 304A finding is appropriate. Thank you. Thank you. Rebuttal. Thank you. There are quite a few things to go through. The difference, I'm going to try to take it a little bit in order. The difference between the words whether or not the salary should be given in 2016 or through 2016, counsel made a reference to a whereas provision in the lease. The employment agreement says specifically in five different locations that he gets that salary through December 31st. He did not. He only got salary through December 25th. Let's forget about transfer of title for the moment. How much money are you claiming and did you claim in this case that your client was deprived of? So we asserted that they failed to pay $2,200 in payroll in that last week of December 2016. We did not file a count to force them to make that payment. We said their failure to make that payment means we don't have to go forward with the option to purchase on those special, unique, sweetheart deal terms. Look, look, I get that there's some seller remorse here, okay? I get it. But what I don't get is where's the money? What are you talking about with the specific amount of money and why wasn't there an action for that amount of money and a claim for it and damages? Because we didn't need to. We don't need to make a claim that they must pay us that money. We are saying because they didn't pay us that money, we don't have to go forward with the option to sell. Just like in the other cases where the condition precedent was mail me a letter with written notice that you want to terminate the lease, there's no count saying you must send me that letter. It's just you didn't send me that letter. I don't have to go forward with the option. You must meet all of the conditions precedent, whatever those are. You must meet those in order to go forward with the unilateral contract for an option to purchase, right? Whether it's $2,000 or $6 or a written letter received at a particular address compared to a different address, the nominality doesn't really matter because even a written letter sent to a different address where the other party, the landlord concedes that they had oral notice, in cases that very small deficiency is enough to say you don't go forward with the option to purchase. Here we have $2,200 in payroll that's missing for the last week. We had $6 that was taken from Jesse Richardson and then not given to his 401k. That was a known deficiency noted by the union, agreed by core mechanical and very, very, very late correction after the lawsuit was filed. There was $902, excuse me, $92 for three hours of June 16th hours that weren't reported correctly. Is this case in the municipal division? No, it was the chancery. Chancery, yeah. Chancery, yep. For $6. Well, the value of the property is a lot. Yeah. All right, why don't you, we've already spent six minutes talking about $6, why don't you wrap up? Sure. I'd like to address the question about the holidays, the Martin Luther King Day, and the President's Day. Counsel, and in the briefs, this was raised that the whole issue about whether or not Jesse did work or didn't work, there are two different issues here. He gets a salary. And just like many people who get a salary, you don't have to do particular work in order to get that salary. You might be on vacation, you might have different things going on, you might be just a figurehead, a CEO of a company, but you get a salary regardless of what you're exactly doing as tasks. The key thing here is, though, CORE had to abide by the union rules to report his hours correctly and pay the correct back-end benefits. He worked those two days. Therefore, they had to report those two days. They did not. The union auditor and the president testified that those were errors, deficiencies, and violations of the union rules. If you take CORE's position that somehow they only need to pay back-end benefits if they report hours, well, then that could mean that they could declare unilaterally that every single day of that year was a holiday and not pay any back-end benefits at all. They'd pay them the salary, but they wouldn't pay the union back-end benefits. That interpretation completely nullifies other parts of the contract. You can't take their interpretation because a fundamental principle of contract rules is you can't interpret one provision in order to nullify other provisions of the contract. I'd like to get into the last argument about there is just excuse about failing to pay the last week here because they misinterpreted what the actual words in the contract mean. That must be a good-faith interpretation because the judge agreed with that interpretation. If we accepted that as a mistake under equity, then every single breach of contract case could be excused. Here, it's especially inappropriate to go down that road because it's not what the contract says in five locations, and they were warned. I'll rest on one more thought, and that is in these thoughts of why does Mr. Richardson stand the ground that a mere $2,000 needs to be paid? In a court of equity, if you're going to go down that road and think about equity comments, when core mechanical was specifically warned, why didn't they just pay $2,000? Why not flip that right back on its head? Core mechanical was the one who deliberately, knowingly, did not make that payment. This was not a mistake. It's not like they thought they made that payment and mailed it to a wrong address. They deliberately did not make that payment because they didn't want to. Okay, I have no questions. Any questions from my colleagues? Okay, thank you both for your briefs and your arguments. We will take this matter under advisement and get back to you with an order or an opinion. We are adjourned.